651 P.2d 859

Kenneth A. VINALL, D.D.S., P. C., an Arizona corporation, Plaintiff/Appellant,

v.

Jon A. HOFFMAN and Charlotte Hoffman, husband and wife, Defendants/Appellees.

No. 2 CA–CIV 4072.

Court of Appeals of Arizona, Division 2.

Feb. 4, 1982.

Rehearing Denied March 16, 1982.

Review Granted April 6, 1982.

Eaton, Lazarus & Rogers, Ltd. by Alfred J. Rogers, Phoenix, for plaintiff/appellant.

Davis, Siegel & Gugino by Robert L. Gugino, Tucson, for defendants/appellees.

## OPINION

BIRDSALL, Judge.

The appellant, Kenneth A. Vinall, D.D.S., P.C., an Arizona professional corporation, was the plaintiff in the trial court. The issue raised in its complaint became moot, but the appellees/defendants, Jon A. Hoffman and wife, prevailed on a counterclaim. The trial court granted their motion for summary judgment, and ordered the appellant to purchase appellee's stock in the corporation. We will refer to the appellees in the singular, as appellee, since Mrs. Hoffman was a party only because of the community nature of appellee's claim.

The appellant contends the trial court erred in concluding that it was required to purchase the appellee's stock when he resigned as an employee of the corporation. We agree with this contention and reverse.

Cross motions for summary judgment were presented to the trial court on stipulated facts. Those facts material to this appeal may be summarized as follows:

1. The appellant has been an Arizona professional corporation since June 1975, with its only purpose being the practice of dentistry.

2. Appellee was employed as a dentist for the appellant since 1975.

3. Appellee was also an officer and director of the corporation.

4. Appellee owns stock in the corporation.

5. On or about December 5, 1978, all the stockholders, employees, officers and di-

rectors entered into an agreement entitled "Stock Restrictions and Purchase Agreement."

6. On October 25, 1979, appellee resigned as an employee of the appellant and offered his stock to the corporation pursuant to the stock restrictions and purchase agreement.

7. The corporation refused to purchase appellee's shares of stock.

8. Appellee was at the time of his resignation, and still is, licensed to practice dentistry in the State of Arizona.

The articles of incorporation, the "Stock Restriction and Purchase Agreement" and appellee's letter terminating his employment and offering his stock were incorporated by reference.

The trial court concluded that the corporation was legally obligated to purchase appellee's shares when he resigned from his employ. That ruling was based upon a provision of the Arizona Professional Corporation Act (the Act), A.R.S. § 10–901 et seq. The particular provision involved is A.R.S. § 10–909(D), which provides:

"Within ninety days following the death, insanity, bankruptcy, retirement, *resignation,* expulsion or other legal disqualification of a shareholder, all of the shares of such shareholder shall be transferred to or acquired by persons qualified to own such shares or by the corporation. Until such transfer is effected such shares shall not be entitled to be voted. Either in its articles of incorporation or its bylaws, the corporation shall fix the price or method of computing the same together with the schedule of payment therefor, for acquiring such shares, in the event the shares are not otherwise acquired within said ninety days by persons qualified to own the same." (emphasis added)

The trial court construed the word "resignation," as used in the statute, to refer to the resignation of a shareholder from employment by the corporation. We disagree with that interpretation.

In construing this provision, we look to the statute itself, to the surrounding provisions, and to the history of the Act. The word "resignation" appears in a list of specific contingencies ending with the general words "or other legal disqualification." This indicates that the "resignation" mentioned in the statute must amount to a "legal disqualification." Unfortunately, the latter term is also without express definition in the Act. The immediately preceding subsection, A.R.S. § 10–909(C), however, refers to shareholders and others who "[become] legally disqualified to render the category of professional service for which the professional corporation was organized." That phrase, we believe, describes "legal disqualification" for purposes of subsection D. We do not believe that such similar terms, appearing in such proximity in the same statute, could have been intended by the legislature to have different meanings. This leads us to conclude that the kind of "resignation" mentioned in subsection D is one that renders the shareholder "legally disqualified to render the category of professional service ..."—in other words, a resignation from the profession, not a resignation from employment by the corporation.

In support of the trial court's construction, appellee relies upon the well established rule that words in a statute should be given their ordinary, common meanings unless they are obviously used in a technical sense, or unless such construction would result in an absurdity. *Kilpatrick v. Superior Court,* 105 Ariz. 413, 466 P.2d 18 (1970). Although agreeing that the rule provides guidance in this case, we believe it requires a different construction than was adopted by the trial court.

In ordinary usage, "resignation" refers to a voluntary, unilateral surrender of an office or position. The term presupposes that the office or position is one capable of such a surrender. The statute under discussion, however, is concerned with corporate shareholders. Unless the Act has created something less similar to a corporation than we believe was intended, the position of a corporate shareholder is not one that ordinarily

is voluntarily and unilaterally surrendered. It becomes evident, therefore, that the word "resignation," applied as it is to a corporate shareholder, simply has no ordinary, common meaning.

Furthermore, the construction urged by appellee would lead to an absurd result, in light of other provisions of the Act. The Act provides for the organization of corporations for the purpose of rendering certain professional services. Its only prescribed qualification for the ownership of shares in those corporations is that the shareholders be duly licensed to render the category of professional service for which the corporation was organized. A.R.S. §§ 10–902(4), 10–907(C). Nothing in the Act requires a shareholder to be an employee of the corporation. Since non-employees may own stock in a professional corporation, why would the legislature require the corporation to purchase an employee's shares simply because the employee resigns from employment?

In further defense of the trial court's construction, appellee points to the unfortunate result that will flow from an interpretation of the statute that does not require the corporation to purchase his shares. He will be left with shares that represent a sizeable investment, but for which there is no ready market. We realize that the lack of a market for shares in professional corporations creates a substantial risk for departing shareholders of such corporations. We also recognize a concomitant risk to the remaining shareholders: that the departing shareholder may sell his shares to an outsider who is "unacceptable" to the remaining shareholders and who might become a disruptive influence in the conduct of corporate affairs. Both of these risks are inherent hazards of operating in the corporate form. Protection against these hazards has not been imposed by the legislature.

Shareholders may, however, protect themselves. The second of the hazards, that of share transfers to "unacceptable"

outsiders, was anticipated by the legislature when it adopted A.R.S. § 10–908(6), which provides that a professional corporation shall:

"Permit shares to be transferable to persons duly licensed to perform the same category of professional service as that for which the professional corporation was organized, or to the professional corporation itself, *provided that this shall not be construed to prohibit such further lawful restrictions thereon upon which the shareholders may agree.*" (emphasis added)

This provision of the statute allows shareholder agreements, such as the agreement tangentially involved in this case, that protect against the hazard of sales to outsiders. Similar agreements, although not so expressly authorized by statute, may be used to protect against the hazard of being saddled with unmarketable shares. *See* e.g., Williams and Mathews, "Effective Estate Planning for Shareholders in Professional Corporations," 36 Journal of Taxation 269 (May, 1972); Jacobs, "Stock Ownership Control Agreements for Professional Corporations," 45 Fla. Bar Journal 336 (June, 1971). Unfortunately for appellee, and perhaps for those remaining shareholders who may someday find themselves in similar straits, the agreement made in this case does not fully protect departing shareholders from that risk. The agreement gives the corporation or the remaining shareholders an option to purchase the shares. A binding "buy and sell" agreement would have required the purchase. A.R.S. § 10–909(D) cannot be interpreted to provide that protection, since that was not the intention of the legislature.

The wording of the statute provides a clue to the legislature's real intent. The list of specific contingencies, "death, insanity, bankruptcy, retirement, resignation, expulsion," appears to be unique to the Arizona statute on this subject.[1] This list was taken almost verbatim from one of the so-called

---

1. Similar statutes in most other states require the corporation to purchase only the shares of shareholders who are "deceased or disqualified." See generally CCH Professional Corporations Handbook, ¶ 5001 et seq.

**334**

"Kintner Regulations," Treas.Reg. § 301.-7701–1 et seq., 1960–2 Cum.Bull. 409, which were in effect when the Act was passed. Those regulations listed the characteristics of an organization that would be recognized as a "corporation" for federal income tax purposes. One of these characteristics was "continuity of life." Elaborating upon that requirement, Treas.Reg. § 301.7701–2(b)(1) provided:

> "An organization has continuity of life if the *death, insanity, bankruptcy, retirement, resignation, or expulsion* of any member will not cause a dissolution of the organization." (emphasis added)

This leads us to conclude that the true purpose of § 909(D) was to assure that professional corporations would have "continuity of life," by establishing a mandatory procedure to be followed after the occurrence of an event that might lead to the dissolution of the corporation. That purpose would not be served by requiring the corporation to purchase shares owned by a resigning employee, since the employee's resignation poses no threat to the continued life of the corporation. A shareholder's resignation from the profession, on the other hand, would pose such a threat. The Act explicitly requires all shareholders to be "duly licensed," and a lengthy continuation of corporate business after such a resignation would therefore subject the corporation to involuntary dissolution in an action brought by the attorney general under A.R.S. § 10–094.

We hold, then, that the list of contingencies appearing in A.R.S. § 10–909(D) is intended to be a list of events that leave shares in the hands of persons not legally qualified to render the category of professional service for which the corporation was organized. The word "resignation" therefore refers to resignation from the profession, not to resignation from employment by the corporation. Since appellee remains duly licensed to practice dentistry in Arizona, appellant was not required to purchase appellee's stock.

The judgment is reversed and remanded with directions to enter judgment in favor of appellant.

HOWARD, C. J., and HATHAWAY, J., concur.